# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| RENAUD MARIOTTI & R1, LLC | CASE NO: |
| *Plaintiffs,* | |
| v. | **COMPLAINT** |
| WORLD GLOBAL FINANCING, INC., & CYRIL ESKENAZI, | |
| *Defendants.* | |

Plaintiffs Renaud Mariotti ("Mariotti"), and R1, LLC ("R1") (collectively "Plaintiffs"), by and through their undersigned counsel, file this Complaint for damages and declaratory relief against World Global Financing, Inc. ("WGF") and Cyril Eskenazi ("Eskenazi") and in support states as follows:

## NATURE OF THE ACTION

1. This is an action for damages caused by violations of the Securities Act of 1933, 15 U.S.C. §§77a *et. seq.* (hereinafter the "1933 Act"), the Florida Securities and Investor Protection Act, Chapter 517 Florida Statutes (hereinafter the "FSIPA"), the Fair Labor Standards Act of 1938, 29 U.S.S. §§201 *et. seq.* (hereinafter the "FLSA") and unjust enrichment.  Additionally, Plaintiffs bring suit for declaratory relief.

2. As alleged in detail below, Defendants solicited investors throughout the country to invest in their securities identified as "Participation Certificates."  Defendants issued or sold these unregistered securities in intrastate and interstate commerce in violation of

1

§77e of the 1933 Act and §517.07 of the FSIPA.  These certificates securitized loans made to various merchants throughout the country.  Mariotti was an early investor in WGF and, ultimately, began working for WGF and Eskenazi.  Despite adopting the role of employee, Marriotti was not paid for the services rendered to Defendants. After a rocky two year relationship in which Mariotti helped grow the Company, Mariotti separated from WGF in mid-September 2012.  Mariotti left the Company because of Eskenazi's sloppy handling of the business and his refusal to abide by Mariotti's guidance regarding the necessity of various corporate reforms and operational controls. The Parties presently are embroiled in a dispute centered on certain contractual agreements between Plaintiffs and Defendants.  These agreements contain various restrictive covenants.  Plaintiffs maintain that these agreements are unenforceable.

3.  Plaintiffs, individually and/or collectively, seek (1) payment of damages or a refund of their investment based on Defendants' violations of the 1933 Act and FSIPA; (2) payment for hours and overtime worked and liquidated damages that Marriotti was deprived of due to Defendant's violations of the FLSA; (3) payment of damages stemming from Defendant's unjust enrichment at Mariotti's expenses (4) and a Declaratory Judgment that certain contracts between Plaintiffs and World Global Financing, Inc. are void. Additionally, Plaintiffs seeks reasonable attorney's fees and costs pursuant to 29 U.S.C. §216(b), §542.335(1)(k) Florida Statutes, and §517.211(6) Florida Statutes.

## <u>JURISDICTION</u>

4.  This Court has federal question jurisdiction over the Securities Act of 1933 claim based on 28 U.S.C. §1331.

5. This Court has federal question jurisdiction over the the Fair Labor Standards Act claims based on 28 U.S.C. § 1331.

6. This Court has pendant jurisdiction over both the Declaratory Judgments Act claims and all state law claims under 28 U.S.C. §1367.

## VENUE

7. All parties to this action are located within the Southern District of Florida, Miami Division.  Further, the acts complained of took place within this District and Division; therefore, proper venue for this action lies within the Southern District of Florida, Miami Division.

## PARTIES

8. Plaintiff, Renaud Mariotti is an individual and former employee of World Global Financing, Inc.    At all times relevant to this dispute, Mariotti was an employee within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.  Mariotti is also a purchaser of certain unregistered securities issued and/or offered for sale by World Global Financing, Inc. Marotti is a resident of the State of Florida.  Finally, Mariotti is a managing member of R1, LLC.

9. Plaintiff R1, LLC is a limited liability corporation organized under the laws of the State of Florida.   R1's principal place of business is 20533 Biscayne Blvd, Suite 462, Aventura, FL 33180.

10. Defendant World Global Financing, Inc. ("WGF") is a for-profit corporation organized under the laws of the State of Florida.  WGF's principal place of business is 141 NE 3rd Ave, 10th Floor, Miami, FL 33132.  WGF is an employer within the meaning of 29

U.S.C. §203(d) of the FLSA.  WGF is a seller, an offeror, and an issuer of unregistered securities, as those terms are defined in 15 U.S.C. §§77b and 77e.

11. Defendant Cyril Eskenazi ("Eskenazi") is an individual and president of World Global Financing, Inc.  On information and belief, Eskenazi resides at 888 Biscayne Blvd, PH 5701, Miami, FL 33132.  At all times relevant to this dispute, Eskenazi has been a "controlling person" as defined by 15 U.S.C. §77(o) and a "seller" within the meaning of 15 U.S.C. § 77(e).

## GENERAL ALLEGATIONS

12. World Global Financing, Inc. ("WGF") was founded by Cyril Eskenazi in April 2008, and initially operated out of his condominium in Miami.

13. From its inception, WGF has been engaged in the commercial cash advance and alternative loan business.

14. Although originally launched with his own money, Eskenazi subsequently began soliciting investors to invest their capital in WGF.

15. Since its inception, WGF has grown from a small, one-man operation funded by Eskenazi himself to a company with roughly 25 employees that processes tens of millions of dollars annually.

16. As WGF grew, it gradually expanded its reach:  The Company has dozens of brokers scattered throughout the country.  These brokers solicit investors throughout the country, but principally in Florida, New York and California.  These investors then invest their money with WGF.  WGF, in turn, issues its investors Participation Certificates.  Through these Participation Certificates, investors invest in loans to specific merchants.  WGF then loans the invested funds to merchants throughout the country.

4

17. Investors earn a return on their investments on a merchant-by-merchant or loan-by-loan basis. In essence, WGF has securitized short-term commercial loans. When the merchants repay their loans, the returns on those specific merchant loans are then distributed to the investors in those specific loans on a pro rata basis, minus a management fee and a brokerage fee.

18. Mariotti was one of the early investors in WGF. Mariotti began investing with WGF in October 2012. Over the course of the next five months, Mariotti invested a total of $150,000.00 with the Company.

19. In investing his money with WGF, Mariotti, through the corporate form R1, LLC, entered a Master Participation Agreement and subsequently received Participation Certificates in certain aspects of the venture.

20. In October 2012, at the time of his initial investment, Eskenazi allowed Mariotti to come to the WGF office and monitor his individual investment.

21. Shortly after he began going to the WGF office to monitor his investment, Mariotti began to take note of numerous shortcomings in WGF's operations.

22. For instance, at this time, WGF was operating from a shared office location in downtown Miami and had approximately six individuals working for the company. None of these individuals were 1099 or W2 employees. There were no employment forms. WGF paid no employment taxes. There was no payroll.

23. When Mariotti expressed concerns about these operational issues to Eskenazi, Eskenazi asked Mariotti to assist him with the operational side of the business. Mariotti agreed to do so.

24. From October 2012 until January 2014, Mariotti worked for Eskenazi and WGF without any compensation.  At some point, Eskenazi gave Mariotti the title of Chief Operating Officer.

25. During that time, Mariotti used his best efforts to reform the operational aspects of the business.

26. Throughout Mariotti's tenure with WGF, he repeatedly alerted the Company and its principal Eskenazi to numerous operational flaws and compliance issues and did everything within his authority to resolve and correct those issues.

27. Shortly after beginning this operational role with WGF, Marriotti immediately resolved the Company's employment issues by insisting upon proper paperwork for all employees and a proper payroll system.

28. In 2013, Mariotti began alerting Eskenazi to numerous regulatory and compliance issues. These issues included the following:

29. WGF sells securities to investors throughout the country.  WGF has never registered with state or federal securities agencies.  WGF has never registered its securities for sale with state or federal securities agencies.   WGF has never issued a private placement memorandum.  Rather, WGF simply signs investors to Participation Agreements and issues them Participation Certificates.

30. This sort of informal operation has allowed WGF to market and sell its securities to investors without being tied to any formal representations regarding the securities at issue (e.g. a PPM).  Instead, operating in this informal manner, WGF makes numerous material misstatements and misrepresentations about the securities being sold, the Company's

historical returns, the Company's balance sheets, the Company's operations and the risks attendant to investing in the securities.

31. WGF comingles all of the funds at its disposal in numerous company bank accounts. New investor money, existing investor money, and repayments from merchants are not segregated. Likewise, there is no separation between funds that represent money collected on each loan. In other words, based on WGF's model, each merchant loan represents an individual security. When the merchants repay these loans, the repaid funds from multiple loans are comingled into the same accounts.

32. Further, Eskenazi maintains no separation between WGF corporate accounts and his personal accounts. When a major deposit is made into the WGF corporate accounts, it is not uncommon for Eskenazi to make a major withdrawal from the corporate accounts that same day.

33. In light of these sorts of operational shortcomings, WGF routinely experiences problems calculating and reconciling the value of its investors' holdings. For instance, each week, investors receive a report detailing their holdings with WGF. And, each week, these reports are riddled with errors and inaccuracies. WGF simply lacks proper procedures and protocols for reconciling the daily balances or value of the securities at issue.

34. At the other end of the spectrum, in dealing with merchants who are delinquent on their payments, Eskenazi has instructed WGF employees to use creative and often illegal means to collect the money owed.

35. For instance, on numerous occasions, Eskenazi instructed WGF employees to contact delinquent merchants via telephone and impersonate representatives of another cash advance company. Essentially, the WGF employees – at Eskenazi's direction – would

offer to "buy out" the WGF debt on unbelievable terms.  The WGF employees would represent that if the merchant could come up with part of what was owed to WGF, and pay that money to them immediately (to the fake cash advance company), then they would somehow extinguish the WGF debt and the merchant could repay the fake company on a more lenient repayment schedule.  In some instances, this worked.  The merchants would find money any way possible, pay it to WGF thinking they were paying this other company and extinguishing their WGF debt and – ultimately – wind up in an even more perilous financial situation.

36. When Mariotti learned of this practice, he immediately confronted Eskenazi and ordered all WGF employees to stop engaging in this unethical conduct.  Unhappy with Mariotti's guidance, Eskenazi suspended Mariotti from work for three days.  Ultimately, when Mariotti returned to the office, the practice had stopped.

37. The relationship between Mariotti, WGF and Eskenazi ultimately reached its breaking point in September 2014.  On September 7, 2014, Mr. Eskenazi sent an email to Mariotti that reveals a litany of operational failures in the Company.

38. In that email Mr. Eskenazi expressed concerns about a discrepancy between the amount of receivables WGF represented to potential investors and the amount of receivables WGF actually had.

39. Mr. Eskenazi noted, "Thanks to our amazing accounting department we went ahead and claimed we had $12M of receivable assets. The real numbers are more $6M + mgt fees receivables + loan receivables = $7M."

40. Mr. Eskenazi indicated that he had to pay $500,000.00 in taxes for 2013, which would reduce the Company's bankroll correspondingly.

41. Mr. Eskenazi felt WGF's level of funding had reached "an alarming low" and he stressed the immediate need for an injection of millions of dollars' worth of capital.

42. Presently, certain investors are interested in buying a major stake in the WGF operation. Mr. Eskenazi is "scared to death" of signing a deal with such investors because he knows that he could never honor the terms of any funding commitment.  He further knows that any representations and/or warranties regarding WGF and its finances would be rife with errors and therefore false.   In Eskenazi's own words:  "To be honest with you, after reading the legal docs the attorney have been drafting I am scared to death to sign any deal: the monthly commitment we made on paper, the default rate caps, the fact that 100% of my money is controlled by some dudes i don't know, our inability to provide even one report without making mistakes, the complexity of the reporting I have to assume without making errors while relying on accountants who don't know on what planet they are and all the other possible breaches that could happen...ect."

43. Ultimately, Eskenazi concluded that the best solution to WGF's cash flow problems was to send Mariotti to New York to raise $10 million worth of new capital.

44. But Mariotti never went to New York to solicit new investors for WGF.  Instead, shortly after receiving that September 7th, 2014 email from Eskenazi, Mariotti resigned.

45. Since his resignation, the Parties have been engaged in a dispute regarding Mariotti's ability to start his own business in this same market space.  Defendants maintain that various restrictive covenants contained in certain agreements between the Parties prohibit Mariotti from launching a similar venture.   The Parties have exchanged threats of litigation and engaged in settlement negotiations, but to no avail.

## The Employment Agreements

46. During Mariotti's relationship with WGF and Eskenazi, the Parties entered various agreements [Exhibit A] as follows:

### The Master Participation Agreement

47. The Parties entered a Master Participation Agreement dated October 12, 2012 ("MPA").

48. The MPA is an agreement between two companies: WGF and R1, LLC.

49. The MPA was signed only by Mariotti in his official capacity as President of R1, LLC.

50. The MPA amounts to the sale of certain WGF securities (i.e. Participation Certificates).

51. The MPA represents and warrants that WGF was in full compliance with all applicable laws and regulations.

52. The MPA contains both non-compete and non-solicitation provisions.

### Referral Agreement

53. The Parties entered a WGF Investor Referral Management Fee Agreement dated July 20, 2013 ("Referral Agreement").

54. The Agreement provided that the Plaintiffs would receive a referral fee for referring investors to WGF.

55. The Referral Agreement contains one restrictive covenant:   A no-hire provision indicating that during the term of the Agreement and for a period of 24 months thereafter, neither party will hire or attempt to hire the employees of the other party.

### Confidentiality Agreement

56. On a date uncertain, the Parties entered a stand-alone Non-Solicit and Confidentiality Agreement ("Confidentiality Agreement").

57. The Confidentiality Agreement contains confidentiality and non-solicitation provisions.

**COUNT I – SALE OF UNREGISTERED SECURITIES IN VIOLATION OF §77e OF THE 1933 ACT**
**(Against all Defendants)**

58. Plaintiffs re-allege and reassert the allegations contained in Paragraphs 1 – 52 above, as if fully incorporated herein.

59. No registration statement was filed or in effect with the SEC pursuant to the Securities Act and no exemption from registration exists with respect to the securities and transactions described in this Complaint.

60. Since a date unknown but since at least April 2008 through present, Defendants Eskenazi and WGF, directly and indirectly, have: (a) made use of the means or instruments of transportation or communications in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities, as described in this Complaint, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described in this Complaint, without a registration statement having been filed or being in effect with the Commission as to such securities.

61. Eskenazi and WGF, directly and indirectly, offered to sell, and indeed sold these securities to Plaintiffs without a registration statement having been filed or being in effect with the Commission as to such securities.

62. By reason of the foregoing, Defendants Eskenazi and WGF, directly and indirectly, have violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

63. As a direct and proximate result of the conduct alleged herein, Plaintiffs have suffered damages in connection with his investment in WGF's Participation Certificates.

WHEREFORE, Plaintiffs request this Court enter judgment in favor of Plaintiffs and against Defendants for revocation of the Contract, rescission of the Contract, damages, return of all deposits and consideration paid by Plaintiffs, interest on the deposit and consideration amounts, and attorney's fees and costs, and such other and further relief as this Court deems just and proper.

## COUNT II – SALE OF UNREGISTERED SECURITIES IN VIOLATION OF §517.07 OF THE FSIPA
### (Against all Defendants)

64. Plaintiffs re-allege and reassert the allegations contained in Paragraphs 1 - 52 above, as if fully incorporated herein.

65. The Contracts executed by Plaintiffs and Eskenazi are securities as defined by Florida Statutes, § 517.021(21)(q). The Contracts involved the investment in collateral pools of potential receivables transactions between merchants and their customers and the associated management of such investments.

66. WGF is a person and issuer, as said terms are defined by Chapter 517, Florida Statutes. Defendant Eskenazi is a person and issuer, as said terms are defined by Chapter 517, Florida Statutes.  Defendant Eskenazi is a promoter, as said term is defined by § 517.021(18) Florida Statutes, as a result of Defendant Eskenazi having directly taken the initiative in founding and organizing the business and enterprise of WGF. Pursuant to § 517.021(14) Florida Statutes, any person who acted as a promoter of WGF shall be deemed an issuer.

67. Florida Statutes, § 517.07 precludes the sale or offering for sale of any security within the State of Florida unless a registration statement is filed and in effect. Pursuant to § 517.12(1), no issuer shall sell or offer for sale any securities in or from an office in the State of Florida by mail or otherwise unless the person is registered with the State of Florida Office of Financial Regulation. The term "sale" means any contract of sale or disposition of any investment, security, or interest in a security, for value. F. S. § 517.021(20).

68. The Contracts entered into by Plaintiffs are investment contracts. The Participation Agreements at issue in this case is a hotel condominium. The Contract required and led Plaintiffs to invest their money in a common enterprise whereby Plaintiffs were led to expect profits including, and not limited to, revenues from the collection of receivables in transactions between merchants and their customers, solely from the efforts of WGF or other third parties, designated or arranged for by WGF. The offering of the contracts by WGF to Plaintiffs involved offerings of the opportunity to participate in agreements and arrangements whereby Plaintiffs may earn a return on his investments through the management efforts of WGF or other third parties, designated or arranged for by WGF. In conjunction with the foregoing offerings, WGF furnished profit projections to Plaintiffs as part of the contractual agreement with Plaintiff. Pursuant to the offerings, Plaintiff is dependent upon the efforts of WGF or other third parties, designated or arranged for by WGF, to make a profit and are at risk of financial losses.

69. The contracts entered into by Plaintiffs are not exempt from the requirements of Chapter 517, Florida Statutes.

70. Defendants failed to register the contracts and offerings pursuant to Chapter 517, Florida Statutes, in violation thereof.

71. Defendants failed to obtain a permit to sell securities pursuant to Chapter 517, Florida Statutes, or otherwise register with the State of Florida Office of Financial Regulation, in violation of thereof.

72. Pursuant to § 517.211(1), any sale made in violation of § 517.07 or 517.12(1) may be rescinded at the election of the purchaser. Pursuant to § 517.211(1), WGF and its officers, directors, partners and agents, who personally participated or aided in making the sales, are jointly and severally liable to Plaintiffs. Pursuant to § 517.241(3), Plaintiffs are entitled to the civil remedies provided by federal securities codes including interest on the deposits to be returned.

73. Defendant Eskenazi is an officer, owner or managing agent of and for WGF, who personally participated and aided in making the sales. Defendant Eskenazi participated in the negotiation of, and arrangements for, and promotion and marketing for, the offering, issuing, and selling of the investments contemplated by the Participation Agreements.

74. Plaintiffs have tendered, or do hereby tender, the return of the contracts, and requested, or do hereby request, Defendants to return all deposits and consideration paid, but Defendants have refused.

75. As a result of the foregoing, Plaintiffs hereby revoke and rescind the contracts, and have suffered damages including the deposits and consideration paid on the contracts, interest on the deposit funds, court costs, and attorney fees.

WHEREFORE, Plaintiffs demand judgment against Defendants for revocation of the contracts, rescission of the contracts, damages, return of all deposits and consideration paid, interest on the

deposit and consideration amounts, and attorney's fees and costs, and such other and further relief as this Court deems just and proper.

## COUNT III - VIOLATION OF THE FAIR LABOR STANDARDS ACT (NON-PAYMENT OF MINIMUM WAGE)
### (Against Defendant World Global Financing, Inc.)

76. Plaintiff re-alleges and reasserts the allegations contained in Paragraphs 1 – 52 above as if fully incorporated herein.

77. WGF is an "Enterprise engaged in commerce" as that term is defined by 29 U.S.C. §203(s) of the FLSA.

78. At all times relevant to this action, WGF has had employees engaged in interstate commerce and has had annual gross business in excess of $500,000.

79. Defendant willfully failed to compensate Plaintiff at the minimum rate from October 2012 to January 2014.

80. Defendant, by such failure, willfully violated the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 206.

WHEREFORE, Plaintiff requests this Court enter judgment in favor of Plaintiff and against Defendant for:

1) all amounts of minimum wages that Plaintiff should have received under the Fair Labor Standards Act but for Defendant's willful violation of Plaintiff's rights, plus an equal amount in liquidated damages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b); and

2) all reasonable costs and attorney's fees pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b).

### COUNT IV - VIOLATION OF THE FAIR LABOR STANDARDS ACT (NON-PAYMENT OF OVERTIME WAGES)
### (Against Defendant World Global Financing, Inc.)

81. Plaintiffs re-allege and reassert the allegations contained in Paragraphs 1 – 52 above as if fully incorporated herein.

82. WGF is an "Enterprise engaged in commerce" as that term is defined by 29 U.S.C. §203(s) of the FLSA.

83. At all times relevant to this action, WGF has had employees engaged in interstate commerce and has had annual gross business in excess of $500,000.

84. Defendant willfully failed to compensate Mariotti for overtime from October 2012 through January 2014.

85. Defendant, by such failure, willfully violated the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 207.

WHEREFORE, Mariotti requests this Court enter judgment in favor of Plaintiff and against Defendant for:

1) all amounts of overtime wages that Plaintiff should have received under the Fair Labor Standards Act but for Defendant's willful violation of Plaintiff's rights, plus an equal amount in liquidated damages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b); and

2) all reasonable costs and attorney's fees pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b).

### COUNT V– UNJUST ENRICHMENT
### (Against All Defendants)

86. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 57 as if fully set forth herein.

87. Plaintiffs conferred an economic benefit on Defendants.  Specifically, Plaintiffs worked for Defendants in helping them grow the WGF business without any compensation for more than a year and a half.

88. Defendants have been unjustly enriched at Plaintiffs' expense.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages and such other and further relief as this Court deems just and proper.

## COUNT VI - DECLARATORY JUDGMENT UNDER 28 USC § 2201
## THAT MASTER PARTICIPATION AGREEMENT IS VOID AND UNENFORCEABLE

89. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 57 as if fully set forth herein.

90. The Parties entered a Master Participation Agreement dated October 12, 2012 ("MPA").

91. The MPA is an agreement between two companies: WGF and R1, LLC.

92. The MPA contains various restrictive covenants.

93. Mariotti separated from WGF in mid-September and is presently establishing his own business in the same market space.

94. Following Mariotti's separation from WGF, a dispute has arisen between the Parties regarding the enforceability of the restrictive covenants contained in the MPA.

95. The MPA and the restrictive covenants contained therein are void and unenforceable.

96. The MPA and the restrictive covenants contained therein are void and unenforceable because the MPA constitutes the sale of unregistered securities in violation of Florida law.

97. The restrictive covenants contained in the MPA are unenforceable because they are not supported by a legitimate business interest.

98. The restrictive covenants contained in the MPA are unenforceable because they are not supported by any consideration.

99. The restrictive covenants contained in the MPA are unenforceable against Mariotti, individually, because the MPA was signed only by Mariotti in his official capacity as President of R1, LLC.

100.    For the foregoing reasons, Plaintiffs request the Court enter a declaratory judgment holding that the restrictive covenants contained in the MPA are unlawful, void and unenforceable under Florida Statutes 542.335.

## COUNT VII - DECLARATORY JUDGMENT UNDER 28 USC § 2201 THAT REFERRAL AGREEMENT IS VOID AND UNENFORCEABLE

101.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 57 as if fully set forth herein.

102.    The Parties entered a WGF Investor Referral Management Fee Agreement dated July 20, 2013 ("Referral Agreement").

103.    The Referral Agreement contains one restrictive covenant:  A no-hire provision indicating that during the term of the Agreement and for a period of 24 months thereafter, neither party will hire or attempt to hire the employees of the other party.

104.    The relationship between the Parties outlined in the Agreement does not support enforcement of any restrictive covenants.

105.    Mariotti separated from WGF in mid-September and is presently establishing his own business in the same market space.

106.     Following Mariotti's separation from WGF, a dispute has arisen between the Parties regarding the enforceability of the restrictive covenant contained in the Referral Agreement.

107.     The restrictive covenant contained in the Referral Agreement is unenforceable.

108.     For the foregoing reasons, Plaintiffs request the Court enter a declaratory judgment holding that the restrictive covenant contained in the Referral Agreement is unlawful, void and unenforceable under Florida Statutes 542.335.


**COUNT VIII - DECLARATORY JUDGMENT UNDER 28 USC § 2201
THAT CONFIDENTIALITY AGREEMENT IS UNENFORCEABLE AS WRITTEN**

109.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 57 as if fully set forth herein.

110.     The Parties entered a stand-alone Non-Solicit and Confidentiality Agreement ("Confidentiality Agreement").

111.     The Confidentiality Agreement contains confidentiality and non-solicitation provisions.

112.     Mariotti separated from WGF in mid-September and is presently establishing his own business in the same market space.

113.     Following Mariotti's separation from WGF, a dispute has arisen between the Parties regarding the enforceability of the restrictive covenants contained in the Confidentiality Agreement.

114.     With respect to confidentiality, the Agreement merely prohibits Mariotti from using or disclosing WGF's confidential information.

115.    With respect to non-solicitation, the Confidentiality Agreement purports to bar Mariotti and R1, LLC – generally – from soliciting any of WGF's contacts or working for any entity that solicits WGF's contacts for a period of two years following termination of the Agreement.

116.    At most, the Confidentiality Agreement can prevent Mariotti from soliciting established WGF clients.   WGF's clients are merchants who borrow capital from WGF.

117.    Contacts at the other end of the market – upstream contacts that provide the input capital – are not clients.  They are suppliers.

118.    Under Florida law, restrictive covenants cannot be used to protect supplier relationships.

119.    For the foregoing reasons, Plaintiffs request the Court enter a declaratory judgment holding that the restrictive covenants contained in the Confidentiality Agreement are unenforceable as written under Florida Statutes 542.335.

## <u>CONCLUSION</u>

WHEREFORE, Plaintiffs demand judgment against Defendants on all Counts, compensatory damages, liquidated damages, special damages, refund of their investments, declaratory relief, costs, attorneys' fees, and such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on their FLSA and unjust enrichment claims.


Dated October 4, 2014                                  Respectfully submitted,

                                                       By: s/ *Jonathan Pollard*

                                                       Jonathan E. Pollard
                                                       Florida Bar No.: 83613
                                                       jpollard@pollardllc.com

                                                       Nathan M. Saunders
                                                       Florida Bar No.: 107753
                                                       nsaunders@pollardllc.com

                                                       Jonathan Pollard, LLC
                                                       401 E. Las Olas Blvd. #1400
                                                       Fort Lauderdale, FL 33301
                                                       Telephone: 954-332-2380
                                                       Facsimile: 866-594-5731

                                                       *Attorneys for Plaintiffs*