UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-CV-23672-COOKE/TORRES

RENAUD MARIOTTI & R1, LLC,

       Plaintiff(s),

vs.

WORLD GLOBAL FINANCING, INC.
& CYRIL ESKENAZI,

       Defendants.

_____/

## DEFENDANTS' MOTION TO DISMISS, STRIKE, AND INCORPORATED MEMORANDUM OF LAW

**COME NOW** Defendants, **WORLD GLOBAL FINANCING, INC.** & **CYRIL ESKENAZI**, by and through the Undersigned Counsel hereby files this Motion to Dismiss and Strike pursuant to the Federal Rules of Civil Procedure Rule 12(b)(6) and 12(f) and state as follows:

## FACTS

1. Defendant WORLD GLOBAL FINANCING, INC. (hereafter "World Global") is an experienced funder providing working capital to small and medium sized businesses by purchasing a percentage of the merchant's future receivables, and then collecting payments through either a credit card processing agreement or direct debits from the merchant's banking institution.

2. Plaintiff R1, LLC is an investment corporation that entered into a "Master Participation Agreement" with WORLD GLOBAL wherein it agreed to purchase from WORLD GLOBAL a percentage of certain and specific identified merchant future receivables collected.

3. Plaintiff RENAUD MARIOTTI is the managing member of R1, LLC and a sophisticated business person and private investor who personally managed R1, LLC's stake in the above mentioned future receivables.

4. Plaintiff RENAUD MARIOTTI was allowed to come to the Defendants' office to manage his own accounts.

5. In January of 2014, Plaintiff convinced World Global to hire him on as an Independent Consultant and paid as an independent contractor on a 1099.

6. Plaintiff became so trusted and assumed control over the day-to-day affairs such that he was eventually named the Chief Operating Officer.

7. However, after the Plaintiff learned all of the Defendants' trade secrets and how it operated its business, the Plaintiff began to directly compete with the Defendant in violation of the restrictive covenants entered into between the parties.

8. As a direct result of the dispute over the restrictive covenants, Plaintiffs have filed this action seeking damages for an alleged breach of §77e of the Securities Act of 1933 (15 U.S.C. 77e) for the purported the sale of unregistered Securities. Plaintiffs have also filed claims under Florida Statute §517.07 for the alleged sale of unregistered securities as well as claims for unpaid wages and overtime pursuant to Fair Labor Standards Act, unjust enrichment, and is seeking a declaration that restrictive covenants entered into between the parties are void and unenforceable.

9. However, as the Court will see, Plaintiffs' Complaint must be dismissed as it fails to state a cause of action for which relief can be granted, fails to allege sufficient facts necessary to file a responsive pleading, and is not supported by the law.

## MEMORANDUM OF LAW

Plaintiffs' Complaint does not provide any facts that entitle them to relief.  To survive a motion to dismiss, a Complaint must contain sufficient facts, which accepted as true, state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  A plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Id.*  Since the Plaintiffs failed state a claim for which relief can be granted, the Complaint must be dismissed.

I.   **COUNT I – SALE OF UNREGISTERED SECURITIES UNDER 15 U.S.C.§77E OF THE 1933 SECURITIES ACT IS TIME BARRED BY THE STATUTE OF LIMITATIONS**

Plaintiffs have alleged that the Defendants violated 15 U.S.C. §77e, also referred to as Section 5 of the Securities Act of 1933. 15 U.S.C. §77e makes it unlawful to sell, offer to sell, or deliver unregistered securities by means of mail or the instruments of transportation or communication in interstate commerce.  Furthermore, Plaintiffs have brought this action under the private right of action contained in 15 U.S.C. 77*l* which states:

> (a) In general any person who — (1) offers or sells a security in violation of section 77e of this title …shall be liable … to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

However, the statute of limitations for violations of 15 U.S.C. §77e pursuant to the private right of action contained in 15 U.S.C. 77*l* is **one year** and is contained in 15 U.S.C. §77m.  Specifically, §77m states:

> No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, **if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based**. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l(*a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

Furthermore, accrual of the cause of action begins on the date of the alleged violation, not discovery of the cause of action. See *Temple v. Gorman*, 201 F.Supp.2d 1238 (S.D.Fla., 2002) (holding that the discovery rule does not apply to section 12(a)(1) claims [15 U.S.C. 77*l*]) and *In re Mona Lisa at Celebration, LLC*, 410 B.R. 710 (Bkrtcy.M.D.Fla.,2009) (Section 77m of the 1933 Securities Act governs the statute of limitations for a claim based on liability created by Section 77 l(a)(1), and it provides that such a claim must be brought within one year after the violation upon which it is based.).

The Plaintiffs allege that they invested money with the Defendants beginning October of 2012 through the course of the following next five months, i.e. **October 2012 – February 2013**. (See Paragraph 18 of the Plaintiff's Complaint [DE 1]). Therefore, at the **earliest the Plaintiffs claim became time barred in October of 2013 and the latest in February 2014**. **In this case, the Complaint was not filed until October 4, 2014.** Therefore, Plaintiffs claim under §12(a)(I), which is an action to enforce liability under 77*l*(1), must be dismissed. See *McCarthy v. Barnett Bank of Polk County*, 750 F. Supp. 1119, 1124 (M.D. Fla. 1990) ("Section 13, the applicable statute of limitations for Section 12(1) actions, requires that a Section 12(1) action be brought within one year of the violation."); see also *Mason v. Marshall*, 412 F. Supp. 294, 299 (N.D. Tex. 1974), affd, 531 F.2d 1274 (5th Cir.1976). Furthermore, under Section 13, "Congress did not intend tolling of a Section 12(1) claim." *Id.*; see also *Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 916 F. Supp. 1343, 1353 (D.N.J. 1996) ("[T]he one year limitations period applicable to claims brought under section 12(1) is absolute.")[1]

"In asserting a violation of Section 12, the plaintiff must affirmatively plead sufficient facts in the complaint to demonstrate conformity with the statute of limitations." T*oombs v. Leone*, 777 F.2d 465, 468 (9th Cir. 1985). Because Plaintiffs have failed to do so, and because Plaintiffs brought a Section 12(a)(I) claim against the Defendants more than a year after they allegedly violated that statute, Plaintiffs' claim against Defendants WORLD GLOBAL & CYRIL ESKENAZI must be dismissed.

## II.    SALE OF SPECIFIC FUTURE MERCHANT RECEIVABLES COLLECTED ARE NOT SECURITIES SUBJECT TO REGULATION UNDER 15 U.S.C.§77E WHICH PROHIBITS THE SALE OF UNREGISTERED SECURITIES

The term "Security" is defined in Section 2(a)(1) of the 1933 Act, 15 U.S.C. § 77b(a)(1), to include "any note, stock, treasury stock, security future, bond, debenture, ... investment contract, ... [or any] instrument commonly known as a 'security." "Investment

---

[1] The *Blatt* Court recognized that while this is the majority rule, some courts disagree. One such court is *Eaton v. Coal Par of West Virginia. Inc.*, 580 F. Supp. 572, 576-77 (S.D. Fla. 1984), which held that a Section 12( 1) claim could be equitably tolled. The *Eaton* Court, however, relied on *Kennedy v. Tallant*, 710 F.2d 711,716-17(11th Cir. 1983), which allowed equitable tolling for a Section 10(b) claim, not a Section 12(1) claim. The *Eaton* Court's holding contradicted the precedent established by *Mason* as well as *Summer v. Land & Leisure. Inc*., 664 F.2d 965, 968 (5th CiT. 1981) (court affirmed Southern District of Florida decision that equitable tolling applies to Section 10, but not Section 12 claims.)

contract" is not itself defined, however the cases interpreting what exactly an investment contract is has held that the Courts look to "*whether the scheme involves an investment of money in a common enterprise with profits to come <u>solely from the efforts of others</u>.*" See *SEC v. W.J. Howey Co.*, 328 U.S. 293(1946) (emphasis added).

Although the Supreme Court used the word 'solely' in the *Howey* decision, this Circuit has held that the term 'solely' should not be interpreted in the most literal sense." See *Bambert v. Pulte Home Corporation*, 2011 WL 5105925 (11th Cir. 2011). Instead the test is "*whether the efforts made by those <u>other than the investor</u> are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.*" *Id.*(quoting *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir.1981).

"An interest thus does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business. Rather, the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other third party." *Id.*   "**An investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in a group venture, is not dependent upon the managerial skill of others**." *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir.1982)(emphasis added).

The Court need not look any further than the allegations contained in the Plaintiffs' Complaint to determine that the sale of specific future merchant receivables collected are not securities subject to regulation under 15 U.S.C. 77*l* OR 15 U.S.C. 77e. In this case, **Plaintiffs exercised complete managerial control over its own accounts.** In fact, it was Plaintiffs themselves who chose specifically which accounts to invest in.  Consistent with the fact that the Plaintiff was himself responsible for the management of its own accounts, Plaintiffs allege in their Complaint that "*in October 2012, at the time of his initial investment, Eskenazi allowed Mariotti to come to the WGF office and monitor his individual investment.*" (See also Paragraph 20 of the Plaintiff's Complaint [DE 1]).  Plaintiffs take it one step further and allege that RENAUD MARIOTTI assisted the Defendants with the "operational side of the business" (Paragraph 23 of the Plaintiff's Complaint [DE 1]) and that he worked for Defendants "from October 2012 until January 2014" and was at some point given the title of **Chief Operating Officer** (Paragraph 24 of the Plaintiff's Complaint [DE 1]).

Based solely on the allegations in the Complaint, Plaintiff RENAUD MARIOTTI both managed Plaintiffs' accounts, as well as ran the operations of the entire company. Since the Plaintiff himself was admittedly responsible for the managerial efforts which affected the failure or success of his own accounts, the future receivables complained of are not securities subject to regulation under Section 2(a)(1) of the 1933 Act, 15 U.S.C. § 77b(a)(1) and therefore Count I must be dismissed.[2]

## III.   COUNT I – SALE OF UNREGISTERED SECURITIES UNDER 15 U.S.C.§77E OF THE 1933 SECURITIES ACT FAILS TO ESTABLISH INDIVIDUAL LIABILITY

In order to be liable under 15 U.S.C.A. § 77*l*(a)(1), also known as Section 12(a)(1), a defendant must "offer" or "sell" the security at issue.  Pursuant to *Pinter v. Dahl*, 486 U.S. 622, 642 (1988), in order for Mr. Eskenazi to be personally liable to Plaintiffs, he must be (1) an owner who passed title or other interest in the security, to the buyer for value, or (2) a person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.  In the Eleventh Circuit, the second prong of *Pinter* requires a two-part test: "First, whether the participant in the sale "solicited" the purchase; and second, whether the participant or the owner of the security sold benefited." *Ryder International Corporation v. First American National Bank*, 943 F.2d 1521, 1531 (11th Cir. 1991). See also *Bailey v. Trenam Simmons, Kemker, Scharf Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825, 828 (S.D. Fla.1996) (recognizing Supreme Court's limits on the expansiveness of Section 12 liability).

Plaintiffs do not allege that Mr. Eskenazi was an owner who passed title or other interest in the alleged securities.  Nor do Plaintiffs allege that Mr. Eskenazi solicited their purchase of the purported securities other than to make the conclusory statement that "*Eskenazi and WGF, directly and indirectly, offered to sell*" the purported unregistered securities

---

[2] Even if the sale of specific future merchant receivables could be considered a security under these facts, which it is not, it still would not be subject to the registration requirement contained in 15 U.S.C. 77e as the sales are exempted transactions that do not involve a public offering.  Specifically, 15 U.S.C. 77d(a)(2) states: "*The provisions of section 77e of this title shall not apply to…transactions by an issuer not involving any public offering.*"  In this case the transactions at issue were sold to a sophisticated private business person who himself solicited the sale of the Merchant receivables from Defendant World Global, not the other way around.  There are no allegations anywhere in the Complaint alleging that the Merchant Future Receivables at issue were anything but a private sale. Since the Plaintiffs failed to allege any facts regarding the nature of the Merchant Future Receivables at issue, Count I must be dismissed.

without stating how the alleged offer was made, to whom it was made, when it was made, and what the offer consisted of.

Cases following *Pinter* have required that in order to establish liability under Section 12, a defendant must have **directly or personally** solicited a plaintiff. See *Shain v. Duff & Phelps Credit Rating Company*, 915 F. Supp. 575, 581 (S.D.N.Y. 1996) ("persons are not liable under Section 12 for solicitation unless they directly or personally solicit the buyer"), citing *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 723-24 (S.D.N.Y. 1990) (no Section 12 liability where defendant did not have 'direct contact' or 'personally solicit' plaintiff or other investors.); see also *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir.1998) (dismissal of Section 12(a)(1) claim appropriate when there was no allegation that defendant had "directly sold" plaintiff securities), citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996) (dismissal of Section 12 Claim appropriate when plaintiff merely alleges "bald and factually unsupported allegation that [the defendants] 'solicited' the plaintiffs); *Marshall v. Quinn-L Equities, Inc.*, 704 F. Supp. 1384, 1389 (N.D. Tex. 1988) (Court found defendant who did not have "direct communications" with investors was not a seller under Section 12.)

The Complaint also does not allege that Mr. Eskenazi directly benefitted from the sale of the alleged unregistered securities. Plaintiffs' lack of sufficient facts surrounding the "solicitations" and the lack of any facts regarding how Mr. Eskenazi benefited from this alleged indirect solicitation fall short of establishing that Mr. Eskenazi was a "seller" such that he would be liable under Section 12.  Accordingly, Plaintiffs' Section 12 claim in Count I should be dismissed.

Alternatively, Plaintiffs allege that Mr. Eskenazi is jointly liable as a controlling person. However, Plaintiffs do not allege any facts whatsoever supporting this claim. Pursuant to 15 U.S.C. §77o a controlling person is anyone who "through stockownership, agency or otherwise, controls any person liable under sections 77k or77*l*.

To state a claim for control person liability under this section, Plaintiffs must allege facts that establish: (1) a primary violation of the securities laws by a controlled person; (2) that Mr. Eskenazi had the power to control the general business affairs of the controlled person; and (3) that Mr. Eskenazi "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." See *Slater v.*

*DC 701, LLC*, 2008 WL 2695645 (M.D.Fla.,2008). "The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.*

In the *Slayter* case mentioned above, the Plaintiffs attempted to allege control person liability pursuant to 15 U.S.C. 77o.   Specifically the Plaintiffs' in *Slayter* alleged: "[Defendants] are the principals of each of the [corporate] Defendants and orchestrated the scheme outlined herein and used those entities in furtherance of their scheme" and "[corporate] Defendants served as mere instrumentalities of the ubiquitous [Defendants] created and directed by [Defendants]." The Court stated:

> Even viewing these allegations in the light most favorable to Plaintiffs, they are insufficient to state a claim for control person liability against Defendants. Merely restating the legal standard for control person liability, or in this case, merely alleging that Defendant orchestrated and directed the scheme— without more—is insufficient to plead control person liability.

The Court went on to hold that it was not convinced that Plaintiffs have satisfied their initial burden to allege a primary violation that triggered control person liability. "The success of Plaintiffs' Section 20(a [15 U.S.C. 77o] claims turns on the resolution of their claims under Section 10(b) [the primary violation]". *Id.*

First, in this case, for the reasons stated above, there is no valid claim pursuant to 77*l* or anyone liable for the same.  Second, there are no **factual** allegations in the Complaint alleging that Mr. Eskenazi controlled anyone liable under 77*l*.  Plaintiffs simply make the conclusion that Mr. Eskenazi *"has been a controlling person as defined by 15 U.S.C. §77(e)."* (See Paragraph 11 of the Plaintiff's Complaint [DE 1]). However, pursuant to the above cited case law and the holding in *Papasan v. Allain,* 478 U.S. 265 (1986), on a motion to dismiss, Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* Accordingly, Count I against Mr. Eskenazi personally should be stricken and/or dismissed.

**IV.    PLAINTIFF RENAUD MARIOTTI LACKS THE REQUIRED STANDING TO MAINTAIN COUNT I - SALE OF UNREGISTERED SECURITIES UNDER 15 U.S.C.§77E OF THE 1933 SECURITIES ACT AND COUNT II – SALE OF UNREGISTERED SECURITIES UNDER FLORIDA STATUTE §517.07**

To establish standing a party must "demonstrate that he has suffered an 'injury in fact,' and that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. See *Bennett v. Spear*, 520 U.S. 154 (1997) (internal quotation marks and citations omitted).

In this case, the Plaintiffs have **admitted** that Plaintiff RENAUD MARIOTTI individually has suffered no injury.  For example, in order to establish that the restrictive convents purportedly do not apply to Plaintiff RENAUD MARIOTTI individually, Plaintiffs allege that the "Master Participation Agreement" (which governs the purchased future receivables at issue) was only signed by Plaintiff RENAUD MARIOTTI in his corporate capacity and not individually. See Paragraph 91 of the Plaintiff's Complaint [DE 1] ("**The MPA is an agreement between two companies: WGF and R1, LLC**); See also Paragraph 19 of the Plaintiff's Complaint [DE 1] ("In investing his money with WFG, Mariotti, through the corporate form R1, LLC, entered a Master Participation Agreement and subsequently received Participation Certificates in certain aspects of the venture.").

Plaintiff cannot claim in one instance that he is not a party to the Master Participation Agreement so that he can avoid the restrictive covenants, but then in another instance claim that he suffered an injury individually as a result of his participation in the Master Participation Agreement.  Since Plaintiffs have admitted on the face of their pleadings that "**The MPA is an agreement between two companies: WGF and R1, LLC"**, Plaintiff RENAUD MARIOTTI lacks the standing to maintain Counts I and II and therefore they must be stricken and/or dismissed.

## V.   COUNT II – SALE OF UNREGISTERED SECURITIES UNDER FLORIDA STATUTE §517.07 IS PREEMPTED BY THE NATIONAL SECURITIES MARKET IMPROVEMENT ACT OF 1996 (NSMIA)

Count II of Plaintiffs' Complaint for the sale of unregistered securities under Florida Statute §517.07 is completely pre-empted by the National Securities Market Improvement Act of 1996 (hereafter "NSMIA").

### A. BACKGROUND

Until 1996, both Federal and State regulations governed securities offerings. NSMIA eliminated the dual system of regulations for covered securities offerings and prohibited states from requiring the registration of such securities. Section 18 of the NSMIA (15 U.S.C. § 77r(a)), entitled "Exemption from State Regulation of Securities Offerings," states:

> "[N]o law, rule, regulation, or order or other administrative action of any State or any political local division thereof - requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that ... is a covered security; or ... shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any [covered security]."

During the Congressional hearings on NSMIA, Congress received testimony that "duplicative registration tends to raise the cost of capital to American issuers of securities without providing commensurate protection to investors or to our markets." *Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep.* No. 104-864, 104th Cong., 2d Sess. 1996, 1996 U.S.C.C.A.N. 3920, 1996 WL 559878, at p. 41. One of the principal purposes of NSMIA was to create a "national capital market" which would facilitate the formation of capital by eliminating the cumbersome dual registration process in certain aspects. *Id.* To accomplish this goal, Congress created exceptions to the dual-filing system for "covered securities." The exemption was based on a recognition that "[s]ome securities offerings, such as those made by investment companies, and certain private placements are inherently national in character, and are therefore **subject to only Federal regulation**." *Id.* (emphasis added).   As the Court will see below, the merchant future

receivables at issue, if considered a security at all, would be "covered securities" preempted from State registration requirements.

### B. **COVERED SECURITIES**

"Covered Securities" are defined in 15 U.S.C. § 77r(b)(4)(E) as "a transaction that is exempt from registration under this subchapter pursuant to -- Commission rules or regulations issued under section 77d(2) of this title." As noted above, Section 77d(2) is the section that exempts from the registration requirement "transactions by an issuer not involving any public offering." *Id.* The "Commission rules or regulations" referred to in 15 U.S.C. § 77r(b)(4)(E) specifically refers to Regulation D. Regulation D sets forth certain procedural guidelines for compliance with the registration exemption contained in 15 U.S.C. § 77d(a)(2).

In this case, the merchant future receivables at issue, if considered a security, are exempt from the registration requirement and are therefore considered "covered securities" because they were sold to a particular and select private investor and was not offered for sale to the public in a public offering pursuant to 15 U.S.C. §77d(a)(2).

### C. **NSMIA APPLIED TO THE FACTS OF THIS CASE**

As noted above, NSMIA has expressly pre-empted State transactional registration of "covered securities" and also completely pre-empted State issuer registration requirements to issuers of "covered securities." That same pre-emptive doctrine clearly prevents Plaintiffs' attempt to litigate the qualifications of a "covered security" via a state-law non-registration claim in an effort to avoid the Statute of Limitations.

The Florida Department of Banking and Finance has held in an administrative decision that NSMIA pre-empts transactional registration under Florida Statutes Section 517.07, where a federal "covered security" is involved. See *In re: Petition for Declaratory Statement of the City of Chicago*, 1999 WL 1097980, at * 1 (Fla. Dept. Banle Finan. Nov. 1, 1999). In the *City of Chicago* administrative decision, the City sought the guidance from the State of Florida Department of Banking and Finance regarding the issuance of certain bonds. The City requested that the Department assume that the securities were "covered securities" and requested guidance as to whether the securities would still be subject to

registration under Florida Statutes § 517.07. Relying on the pre-emption language of NSMIA, the Department concluded that certain exemption provisions of Section 517.051 "have been preempted by Section 18(a) of the Securities Act of 1933 and are not applicable to the Petitioner and the bonds it proposes to issue." Id. at *7.[3]

Likewise, in *Temple v. Gorman*, 201 F.Supp.2d 1238 (S.D.Fla. 2002), this Court specifically held that NSMIA preempted Florida Statute §517.07 requiring the registration of securities. In *Temple,* the defendants sold shares of stock to a private investor. The defendant claimed that the shares of stocks were exempt from registration under Regulation D and pursuant to 15 USC 77d(a)(2) which states: "The provisions of section 77e of this title shall not apply to…transactions by an issuer not involving any public offering." However, the plaintiff claimed that the securities at issue were not "covered" because they were not actually exempt pursuant to Regulation D since the private placement did not meet the technical requirements of Rule 506. This Court disagreed and held:

> **Regardless of whether the private placement <u>actually complied</u> with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal "covered securities" because they were sold pursuant to those rules. As a result, Fla.Stat. § 517.07 does not require registration of such securities.** (Emphasis added).

> **Furthermore, any attempt by Florida to require registration of such securities or securities transaction would be preempted by NSMIA. Congress expressed its intent in NSMIA that federal regulations alone should govern the registration of national securities offerings.** (Emphasis added).

This Court further stated: "*The purpose of Congress is the ultimate touchstone in every preemption case. When passing NSMIA, Congress stated its purpose, to further and advance the development of national securities markets and eliminate the costs and burdens of duplicative and unnecessary regulation by, as a general rule, designating the Federal government as the exclusive regulator of national offerings of securities.*" Id. (internal citations omitted).

---

[3] Federal "covered securities" are specifically exempt from transactional registration under Florida law. Florida Statutes § 517.07 provides: (1) It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under s. 517.051, is sold in a transaction exempt under s. 517.061, is a federal covered security, or is registered pursuant to this chapter.

The term "federal covered security" is further defined in Section 517.012, Florida Statutes, which provides: (9) "Federal covered security" means any security that is a covered security under s. 18(b) of the Securities Act of 1933 or rules and regulations adopted thereunder.

In this case, like the *Temple* case, even if the merchant future receivables could be considered a security, which it is not, it would be exempt from registration as it was sold to a particular and select private investor and was not offered for sale to the public in a public offering pursuant to 15 U.S.C. §77d(a)(2).  Defendants suspect that the Plaintiff will argue that all of the requirements of regulation D were not satisfied and therefore the merchant future receivables are non-exempt. However, reliance on this argument is misplaced, as this Court held in *Temple*, actual compliance with the substantive requirements of Regulation D or Rule 506 are not required. Accordingly, because federal law completely pre-empts Florida Statute §517.07, Count II fails to state a claim upon which relief may be granted.

VI. **PLAINTIFFS FAILED TO PLEAD SUFFICIENT FACTS TO ESTABLISH THEY SUSTAINED DAMAGES IN COUNT I - SALE OF UNREGISTERED SECURITIES UNDER 15 U.S.C.§77E OF THE 1933 SECURITIES ACT AND COUNT II – SALE OF UNREGISTERED SECURITIES UNDER FLORIDA STATUTE §517.07**

Plaintiffs have failed to plead any facts sufficient to establish that there are any recoverable damages for Count I - Sale of Unregistered Securities Under 15 U.S.C.§77e of the 1933 Securities Act and Count II – Sale of Unregistered Securities Under Florida Statute §517.07. Pursuant to 15 U.S.C.77*l*[4] the measure of recoverable damages are the consideration paid for the security at issue with interest, **less any income received** upon tender of the security or damages if the security is no longer owned.  The measure of damages for a security that is no longer owned has been held to be "the consideration paid for such security with interest thereon, less the amount of any income received thereon" which is the substantial equivalent of recession.  *Pinter v. Dahl*, 486 U.S. 622, (1988). In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the United States Supreme court stated:

> Section 12(2) specifies the conduct that gives rise to liability for prospectus fraud and expressly creates a private right of action in favor of the defrauded investor, who "may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77 1 (2). Thus, § 12(2) prescribes the remedy of rescission except where the

---

[4] Pursuant to Florida Statute §517.241 the remedies for a violation of chapter 517 are "the same civil remedies provided by laws of the United States for the purchasers or sellers of securities." *Id.*

plaintiff no longer owns the security. See *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (CA2 1979). **Even in the latter situation, we may assume that a rescissory measure of damages will be employed; the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any "income received" on the security.** See H.R.Rep. No. 85, 73d Cong., 1st Sess., 9 (1933) (under § 12, the buyer can "sue for recovery of his purchase price, or for damages not exceeding such price"); L. Loss, Fundamentals of Securities Regulation 1020 (1983) (hereinafter Loss) ("[**W**]hen the plaintiff in § 12 no longer owns the security, damages are to be measured so as to result in the substantial equivalent of rescission")(Emphasis added).

In this case the Plaintiffs fail to allege any facts establishing that they actually sustained any damages.  In fact, **Plaintiffs reaped a profit on their initial investment of the future merchant receivables.**  In *Merzin v. Provident Financial Group, Inc.*, 311 F.Supp.2d 674 (S.D.Ohio, 2004), the Plaintiffs sued for damages as a result of a defective registration statement. The defendants argued that plaintiffs have no damages and the only remedy available, rescission, would actually do more harm than good since plaintiffs purchased the security at $25.00 per share and the stock was trading at the time of the lawsuit in excess of $30.00 per share. Consequently, defendants argued, rescission would result in plaintiffs sustaining rather than recovering damages, so the Court should dismiss the claim. The court agreed and held:

> Although Plaintiffs argue that they are entitled to damages as of the date of the filing of their Complaint, when the price of their stock had dipped below the purchase price, the Court finds that in accordance with *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, (2d Cir.1979), "the value of the stock itself is irrelevant insofar as relief under 12(2) is concerned. If the consideration passing from plaintiff to defendant is money, the amount to be awarded is simple to calculate." Id. at 1036. The Court finds well-taken Defendants' position that Plaintiffs' remedy, rescission, requires them to tender back the stock they have received in exchange for the return of the value of the consideration paid, plus interest. **Because in this case rescission would clearly result in a loss for Plaintiffs, such claim should be and is dismissed.** (Emphasis added).

In this action, since Plaintiffs have no damages as a result of the sale of the alleged unregistered securities, nor have they plead any, Count I - Sale of Unregistered Securities Under 15 U.S.C.§77e of the 1933 Securities Act and Count II – Sale of Unregistered Securities Under Florida Statute §517.07 must therefore be dismissed.

**VII.  PLAINTIFFS FAILED TO ALLEGE SUFFICIENT FACTS TO ENTITLE THEM TO ATTORNEY'S FEES FOR COUNT I - SALE OF UNREGISTERED SECURITIES UNDER 15 U.S.C.§77E OF THE 1933 SECURITIES ACT OR COUNT II – SALE OF UNREGISTERED SECURITIES UNDER FLORIDA STATUTE §517.07**

In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975), the Supreme Court expressed strong support for the "American Rule" which prohibits the imposition of attorney's fees except when authorized by statute or by traditionally recognized exceptions such as a contract.

In this case the Plaintiffs have not alleged that they are entitled to attorney's fees either pursuant to (1) a contract or (2) some other statutory basis for the recovery.  Plaintiffs simply request attorney's fees in the "wherefore clause" in Counts I and II.  Since there are no facts plead that would support an award for attorney's fees, Plaintiffs request for attorney's fees must be stricken as a matter of law.

**VIII.  PLAINTIFFS FAIL TO ALLEGE SUFFICIENT FACTS NECESSARY TO STATE A CAUSE OF ACTION FOR COUNT III – VIOLATION OF THE FAIR LABOR STANDARDS ACT FOR UNPAID MINIMUM WAGES AND COUNT IV - VIOLATION OF THE FAIR LABOR STANDARDS ACT FOR UNPAID OVERTIME**

To survive a motion to dismiss, a Complaint must contain sufficient facts, which accepted as true, state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  A plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Id.*

In this case, Plaintiff has claimed that he is entitled to unpaid minimum wages and overtime for the period of October 2012 – January 2014. However, the Plaintiff's Complaint contains no facts regarding the alleged employment and instead relies on mere conclusions of law. This is important because there was absolutely **no employer/employee relationship** between the parties during this time.  This so called "work" was performed on a **volunteer** basis so that the Plaintiff could personally manage his own interests in the Merchant Future Receivable Accounts and learn how the Defendants' business model worked.  At some

point in January 2014 the Plaintiff was hired on as an independent contractor and paid on a 1099, however prior to that time there was absolutely no employment agreement, nor was there any work performed for or at the request of the Defendants.  Counts III and IV of the Plaintiff's Complaint are nothing more than an attempt to manufacture a claim where none existed for the sole purpose of harassing and bullying the Defendants into releasing the Plaintiffs from the restrictive covenants entered into between the parties.

As stated above, the Plaintiff's Complaint contains no facts regarding the alleged employment and instead relies on mere conclusions of law. Under the Fair Labor Standards Act ("FLSA"), to determine if an individual is an employee, the Courts look at the 'economic reality' of all the circumstances" surrounding the activity. *Brouwer v. Metro. Dade Cnty.*, 139 F.3d 817, 818 (11th Cir.Fla.1998). This analysis is commonly referred to as the "economic reality" test. *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir.1997).[5]  In *Villarreal v. Woodham*, the Court stated that the economic reality test asks "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

The touchstone of the economic reality test is the alleged employee's **economic dependence** on the employer. *Freund v. Hi–Tech Satellite, Inc.*, 185 Fed.Appx. 782, 783 (11th Cir.2006)(citing *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1311 (5th Cir.1976)).  "[T]he final and determinative question must be whether ... the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." *Usery*, 527 F.2d at 1311–12 (5th Cir.1976).

In this action, there was absolutely no dependence on the Defendants by the Plaintiff prior to January 2014.  There was no employer/employee relationship.  Defendant did not control or supervise the Plaintiff in anyway prior to January 2014 and there certainly was no compensation paid by the Defendant because there was no work performed by Plaintiff for Defendant. To reiterate – there was not a single cent paid to Plaintiffs prior to January of

---

[5] We anticipate that the Plaintiffs will argue that the economic reality test should not be applied to a Motion to Dismiss and that the test only applies at the summary judgment stage. However, reliance on this argument would be misplaced as precedent from 11th Circuit Court of Appeals forecloses this argument. Specifically, in *Brouwer v. Metro. Dade Cnty.*, 139 F.3d 817, 818 (11th Cir.Fla.1998), the 11th Circuit Court of Appeals applied the economic reality test while reviewing a motion to dismiss.

2014 from the Defendants. Any income received by Plaintiffs came directly from the management of Plaintiff's own Merchant Future Receivable Accounts. If Plaintiff honestly in believed in good faith that he was employed by the Defendant from October 2012 - January 2014, but did not receive any compensation, then why would the Plaintiff continue working? The only logical answer is that the Plaintiff was not an employee of Defendant. This situation is not unlike a situation where a person volunteers with an organization like Habitat for Humanity in order to learn a trade such as carpentry or masonry.

In *Freeman v. Key Largo Volunteer Fire and Rescue Dept., Inc.*, 2012 WL 5358983 (11th Cir. Fla. 2012), a case factually similar, the Plaintiff was a **volunteer** firefighter who sued the fire department alleging unpaid minimum wages and overtime. The 11th Circuit Court of Appeals applied the economic reality test described above and held that the plaintiff was not an employee of the Fire Department even though she performed work as a firefighter and was even paid a very small wage. The 11th Circuit Court went on to hold that without an employment relationship, the Plaintiff's FLSA claims fail. It is also important to note that in its holding the Court specifically stated: "*We note that Freeman's allegation that he was an employee of the Department and the District is a legal conclusion that we are not bound to accept as true. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).*"

The fact Plaintiff was working to manage his own interest in the Merchant Receivable Accounts are supported by the Plaintiff's own admissions that: "*in October 2012, at the time of his initial investment, Eskenazi allowed Mariotti to come to the WGF office and monitor his individual investment.*" (See Paragraph 20 of the Plaintiff's Complaint [DE 1]). There are no facts in the Complaint demonstrating an employment relationship during the relevant period, nor does Plaintiff allege that there was an employer/employee relationship. Since the Plaintiff was not an employee, Counts III and IV must be dismissed.

**IX.**   **COUNT IV - VIOLATION OF THE FAIR LABOR STANDARDS ACT FOR UNPAID OVERTIME MUST BE DISMISSED BECAUSE EVEN IF THE PLAINTIFF COULD BE CONSIDERED AN EMPLOYEE OF THE DEFENDANTS, WHICH HE IS NOT, HE WOULD BE EXEMPT FROM THE OVERTIME REQUIREMENT**

As noted above, Plaintiff is seeking damages for unpaid overtime from October 2012 – January 2014.  However, the Complaint fails to allege any facts regarding the alleged employment, hours worked, or even the compensation Plaintiff claims he is entitled too. This is particularly egregious considering there was no employment relationship between the parties during that time.  From October 2012 – January 2014 the only involvement Plaintiff had in the Defendant's business was as a guest allowed to come to Defendants' office to manage his own accounts.  After that time, Mr. Eskenazi eventually retained Mr. Mariotti as an independent consultant, being paid as an independent contractor on a 1099. Sometime thereafter, Plaintiff convinced Defendant to give him the title of "Chief Operating Officer." The association ended when it was discovered that Plaintiff was using his access to Defendant's office to discover and misappropriate Defendant's confidential trade secrets and learn Defendant's inner workings. Plaintiffs' access enabled them to learn and model Defendants' business practices such that they could directly compete with the Defendants. As the Plaintiffs readily admit in their Complaint, they have started a business in direct competition with the Defendants notwithstanding the valid contractual restraints.  This claim is nothing more than a pretext directed to the ultimate relief of release from the restrictive covenants entered into between the parties.

Notwithstanding the fact that there was no employment relationship between the parties from October 2012 – January 2014, even if, for argument sake only, Plaintiff could be considered an employee of the Defendant; based on the Plaintiffs' own allegations in the Complaint, if taken as true, he would be exempt from the overtime pay requirement. Specifically, the FLSA exempts from the overtime payment requirement "any employee employed in a bona fide executive, administrative, or professional capacity" 29 U.S.C. § 213(a)(1).  The ultimate inquiry for application of the executive exemption is whether Plaintiff's "primary duty" was "management." *Brillas v. Bennett Auto Supply, Inc.*, 675 F.Supp.2d 1164, 1168 (S.D.Fla.2009).

In this case, the Plaintiff alleges that he assisted the Defendants with the "operational side of the business" (Paragraph 23 of the Plaintiff's Complaint [DE 1]), that he managed his own accounts, and that he was given the title of Chief Operating Officer**.** (Paragraph 24 of the Plaintiff's Complaint [DE 1]).  Based on these facts, as presented in the Complaint, his primary duty was clearly management and therefore exempt from the overtime pay requirements. Therefore, Count IV of the Plaintiff's Complaint must be dismissed.

## X.    UNJUST ENRICHMENT MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION

To state a claim for unjust enrichment, a plaintiff must show that (1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit; (2) the defendant voluntarily accepted and retained the benefit; and (3) under the circumstances it would be inequitable for the defendant to retain the benefit without paying for it. *Tooltrend, Inc. v. CMT Utensil, SRL*, 198 F.3d 802, 805 (11th Cir. 1999).  See also *Electrostim Medical Services, Inc. v. Lindsey*, 2012 WL 1560647 (M.D.Fla. 2012).  To support a claim for unjust enrichment, the benefit conferred must be a **direct** benefit. *Id*. See also *Huntsman Packaging Corp. v. Kerry Packaging Corp*., 992 F.Supp. 1439, 1446 (M.D.Fla. 1998). To satisfy the second and third elements above, a defendant must have "requested the other party to perform the services or knowingly and voluntarily accepted their benefits." *Fowler v. Towse*, 900 F.Supp. 454(S.D.Fla. 1995). However, when a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails. *Asencio v. Wells Fargo Bank*, N.A. (M.D.Fla.,2012)

In this case, Plaintiff's so called "work" was done solely to benefit the Plaintiff by maximizing the returns on his own merchant future receivables.  There was no direct benefit on the Defendants. Benefits conferred on the Defendants, if any, were indirect at best. Second, Plaintiffs completely failed to allege any facts demonstrating that the Defendants requested or knowingly and voluntarily accepted and retained the purported benefit.  Third, the Plaintiffs also failed to allege any facts demonstrating that under the circumstances it would be inequitable for the Defendants to retain the purported benefit without paying for it.  Plaintiffs simply conclude that an economic benefit has been conferred and that the Defendants have been unjustly enriched.  (Paragraphs 87 and 88 of the Plaintiffs' Complaint

[DE 1]).  These allegations are nothing more than legal conclusions unsupported by any ultimate facts.  It has been long held that Courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265 (1986).

Lastly, as noted above, Plaintiffs were permitted to come to Defendants' office and use the Defendants' equipment and personnel so that Plaintiffs could manage their own accounts.  If there was a benefit conferred on Defendants there is no inequity.  If anything, the Plaintiffs were unjustly enriched by Defendants. The use of Defendant's office, equipment, and personnel was adequate consideration under the law for any purported benefit conferred by the Plaintiffs. Therefore for the reasons stated above, Count V of the Complaint must be dismissed.

## XI.   COUNTS VI, VII, AND VIII FOR DECLARATORY JUDGMENTS VOIDING THE RESTRICTIVE COVENANTS MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION

All of the previous counts alleged in the Plaintiffs Complaint are nothing more than a pretext calculated and designed to relieve the Plaintiffs from the bonds of restrictive covenants entered into between the parties. However, as the Court will see, the Plaintiffs failed to allege any facts that demonstrate that the restrictive covenants are anything but valid and enforceable.

First, it has long been held in Florida that covenants that restrict or prohibit competition are enforceable "so long as such contracts are reasonable in time, area, and line of business." *Fla. Stat*. § 542.335(1). See also *MDS (Canada), Inc. v. Rad Source Technologies, Inc.*, 822 F.Supp.2d 1263 (S.D.Fla., 2011).  In this action, the Plaintiffs have failed to allege any facts that the restrictive covenants at issue are not reasonable in time, area, or line of business.  In fact, the Plaintiffs' Complaint is completely silent on the reasonableness of the restrictive covenants and instead relies on tangential arguments regarding alleged securities registration issues and lack of consideration.

Moreover, after a prima facie case for the enforcement of the restrictive covenant is established, the **party opposing enforcement must allege sufficient facts necessary to demonstrate that the restrictive covenants are overbroad, overlong, or otherwise not**

**reasonably necessary to protect the interests of the party seeking to enforce the restrictive covenant**. *N. Am. Prods. Corp. v. Moore*, 196 F.Supp.2d 1217, 1228 (M.D.Fla.2002)(emphasis added).

In this case Plaintiff has not alleged any facts that demonstrate that the restrictive covenants at issue are in any way over-broad, overlong, or not otherwise reasonably related to protect the Defendants' interests.   Plaintiffs merely recite conclusions of law with no factual support or basis.   Because of the fundamental lack of sufficient facts in the Plaintiffs' Complaint, Defendants cannot adequately respond and Counts VI, VII and VIII must be dismissed.

Second, the Declaratory Judgment Act is an enabling Act, which confers a <u>discretion</u> on Courts rather than an absolute right upon the litigant. See *Royal Caribbean Cruises, Ltd. v. Whitefield ex rel. Martinez*, 664 F.Supp.2d 1270 (S.D.Fla. 2009). However, there must be an **actual controversy** for the Court to exercise its discretion. The test to be applied to determine the existence of an actual controversy in the context of a declaratory judgment action is "whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941). See also *Lake Carriers' Association v. MacMullan*, 406 U.S. 498 (1972). **The possibility of future litigation, however, is not sufficient to establish an actual controversy.** *Hewlett-Packard Co. v. Genrad, Inc.*, 882 F.Supp. 1141 (D.Mass.,1995).

In this action, Plaintiffs have not alleged any facts demonstrating the immediacy required under the law to warrant the issuance of a declaratory judgment.   Plaintiffs simply state that a dispute has arisen between the parties and Plaintiff is establishing his own business in the same market place.   (Paragraphs 93 and 94 of the Plaintiffs' Complaint [DE 1]).   Since the Plaintiffs have failed to establish any facts supporting the immediacy of Counts VI, VII, and VIII, these Counts must be dismissed.

## XII.  COUNT VI – FOR DECLARATORY JUDGMENT VOIDING THE MASTER PARTICIPATION AGREEMENT FAILS TO ALLEGE SUFFICIENT FACTS NECESSARY TO STATE A CAUSE OF ACTION

The Plaintiffs are seeking a Declaratory Judgment that the Master Participation Agreement (hereafter "MPA") is void and unenforceable. However, the only statements alleged by Plaintiffs supporting its conclusion is that the "MPA constitutes the sale of unregistered securities" (See Paragraph 96 of the Plaintiff's Complaint [DE 1]) and that there was allegedly no consideration. (See Paragraph 98 of the Plaintiff's Complaint [DE 1]).

Reliance on the claim that the "MPA constitutes the sale of unregistered securities" and that there was no consideration is misplaced.  First, as noted above, there is nothing illegal about the MPA.  The MPA itself is simply an agreement allowing Plaintiff to purchase a percentage of certain and specifically identified merchant future receivables. Furthermore, the merchant future receivables sold to the Plaintiff are not securities under Federal or State Law.  Even if the merchant future receivables could be considered a security, it is exempt from registration.  Lastly, even if the sale of the merchant future receivables was somehow illegal, which it is not, it could be cured by simply filing a registration.

Frankly, the registration issue was created by the Plaintiffs as a "red herring" in an attempt to confuse the issues before the Court. Under Florida Law restrictive covenants are valid if the contractually specified restraint is supported by **at least one** legitimate business interest justifying the restraint and is reasonably necessary to protect that interest. *Fla. Stat.* §542.335. Furthermore, courts are statutorily required to "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." *Fla. Stat.* §542.335(1)(h).

Defendants' trade secrets and business practices as it relates to the direct purchase of Merchant Future Receivables by the Defendants are essential to Defendants' well being and corporate survival.  Because the Defendants have a legitimate business interest to protect, the Court must construe the restrictive covenants in favor of providing reasonable protection to the Defendants.

Lastly, in regard to an alleged lack of consideration, the Plaintiff's participation in the MPA and Defendants allowing Plaintiff to use Defendants' office, equipment, and personnel is consideration enough to support the restrictive covenant contained in the MPA. "A promise, no matter how slight, can constitute sufficient consideration so long as a party agrees to do something that they are not bound to do." *Ashby v. Ashby*, 651 So.2d 246, 247 (Fla. 4th DCA 1995)(citing *Bayshore Royal Co. v. Doran Jason Co. of Tampa, Inc.*, 480 So.2d 651 (Fla. 2d DCA 1985)).   To conclude that consideration is fair or unfair, rather than merely extant, is not the proper province of the court. *Diaz v. Rood*, 851 So.2d 843 (Fla. 2d DCA 2003).   Therefore, for the reasons stated above, Count VI of the Plaintiffs' Complaint should be dismissed as it fails to allege sufficient facts necessary to state a cause of action.

## XIII.   COUNT VII – FOR DECLARATORY JUDGMENT VOIDING THE RESTRICTIVE COVENANTS IN THE REFERRAL AGREEMENT FAILS TO ALLEGE SUFFICIENT FACTS NECESSARY TO STATE A CAUSE OF ACTION

The second restrictive covenant at issue is contained within the parties' Referral Agreement.  The Referral Agreement contains a "no hire" provision prohibiting either party from attempting to hire the employees of the other party during the term of the agreement and 24 months thereafter.   (See Paragraph 103 of the Plaintiff's Complaint [DE 1]). **Plaintiffs have not alleged any facts in the Complaint to demonstrate why the Court should not enforce this agreement other than to state: "the relationship between the Parties outlined in the Agreement does not support enforcement of any restrictive covenants."** (See Paragraph 104 of the Plaintiff's Complaint [DE 1]). This allegation is cryptic and vague at best and does nothing to put the Defendants on notice of what is being alleged against them. There are simply not enough facts alleged in the Complaint for the Defendants to even respond to the Plaintiffs' conclusory statement that the Referral Agreement is unenforceable.  A complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). "While the Court must assume that all of the factual allegations in the Complaint are true, this assumption is inapplicable to legal conclusions." *Ashcroft v. Iqbal, 556 U.S. 662 (2009).*

Therefore, for the reasons stated above, Count VII of Plaintiffs' Complaint should be dismissed as it fails to allege sufficient facts necessary to state a cause of action.

**XIV.    COUNT VIII - FOR DECLARATORY JUDGMENT VOIDING THE NON-SOLICIT AND CONFIDENTIALLY AGREEMENT FAILS TO ALLEGE SUFFICIENT FACTS NECESSARY TO STATE A CAUSE OF ACTION**

The last restrictive covenant the Plaintiffs seek relief from is the Non-Solicit and Confidentially Agreement (hereafter "Confidentially Agreement").  This agreement, as alleged by Plaintiffs, prohibits Plaintiffs from using Defendants confidential information and also from soliciting Defendants contacts for a period of two years following the termination of the Agreement. Plaintiffs admit in the Complaint that solicitation of the Defendants' clients/merchants are properly restricted. (See Paragraph 116 of the Plaintiff's Complaint [DE 1]).

However, Plaintiffs allege that solicitation of Defendants' "contacts" that furnish them with clients/merchants are not subject to restriction. Plaintiffs simply conclude that World Global's "contacts" are "suppliers" and are therefore not protected.  Still, Plaintiffs do not allege any factual basis to support their conclusions that Defendants' "contacts" are suppliers under the law.

The "contacts" that the Plaintiffs seek to solicit are individuals who have substantial relationships with Defendants' current clients and also prospective clients. Under Florida law, an employer has legitimate business interest in prohibiting solicitation of its customers with whom employees have had a substantial relationship. *North American Products Corp. v. Moore*, 196 F.Supp.2d 1217(M.D.Fla. 2002) See also *Milner Voice and Data, Inc. v. Tassy*, 377 F.Supp.2d 1209 (S.D.Fla. 2005)(legitimate business interests justified non-solicitation provisions in former employees' employment contracts, given former employer's substantial relationships with its prospective or existing customers.).

In *Hilb Rogal & Hobbs of Florida, Inc. v. Grimmel*, 48 So.3d 957 (Fla. 4th DCA 2010), an insurance broker entered into a restrictive covenant with its former employer prohibiting him from soliciting its customers following his termination.  Four years later the insurance broker resigned to open his own competing insurance brokerage firm and his former employer filed suit for an injunction.  During the litigation the employer was granted a

temporary injunction and the insurance broker moved to dissolve the same.  After a hearing with the Magistrate the trial court adopted the Magistrates findings that there was no legitimate business interest to protect and dissolved the temporary injunction. The employer appealed and the Fourth District Court of Appeals reversed, stating:

> Based upon the statute's provision that "substantial relationships with **specific prospective or existing customers**" is a legitimate business interest, it appears that even though [insurance broker] brought these customers into [his former employer], [insurance broker] was [an] employee and that was what his job entailed. He was a **sales producer** and **it was his job to find customers**. Even though he was acquainted with some of these people before he worked for [his former employer], he did not have a prior business relationship with them. (Emphasis added)

The District Court went on to hold that: "The general magistrate incorrectly applied the law and the contract to the facts, thus making her finding of no legitimate business interest clearly erroneous…The trial court abused its discretion in adopting the Report and Recommendation of the General Magistrate which was based on both an erroneous view of the law and an erroneous assessment of the evidence." *Id.*

In *Pitney Bowes Inc. v. Acevedo*, 2008 WL 2940667 (S.D.Fla.2008), this Court held a former employee should be enjoined from soliciting prospective and current customers of the employer, and stated:

> An injunction here will not be adverse to the public interest. On the contrary, the public has a cognizable interest in the protection and enforcement of contractual rights. This interest is particularly strong with respect to non-compete agreements, as the Florida Legislature has determined that the enforcement of such agreements is is in the public's best interest

In this case, like the *Grimmel* case mentioned above, the purported "contacts" Plaintiffs seek to solicit are exactly the same as the insurance broker mentioned above that acted as a sales producer whose job it was to find customers.  Simply concluding and labeling the "contact" as a "supplier" is insufficient overcome the holding in *Grimmel* and to state a cause of action.  Defendants here have a legitimate interest in preserving their relationships with their prospective customers and current customers. The Plaintiffs have not stated any facts that demonstrate otherwise. Therefore, for the reasons stated above,

Count VIII of the Plaintiffs' Complaint should be dismissed as it fails to allege sufficient facts necessary to state a cause of action.

## CONCLUSION

**WORLD GLOBAL FINANCING, INC.** & **CYRIL ESKENAZI** respectfully request that this Court enter an Order dismissing Plaintiffs' Complaint and striking their request for Attorney's Fees contained in Counts I and II and granting any and all other relief deemed necessary and appropriate.

Respectfully submitted on this 27th day of October 2014.

By:/s/ Brian Yosef
**Brian Yosef, Esq.**
Florida Bar No. 31179
**Ronald Isriel, Esq.**
Florida Bar. No. 68659
**ISRIEL PONZOLI & SIMPSON, P.A.**
2121 SW 3rd Avenue, 7th Floor
Miami, Florida 33129
Telephone: (305) 577-4800
Facsimile:  (305) 577-4808
Email: byosef@ips-law.com
*Attorney for the Defendants*

## CERTIFICATE OF GOOD FAITH CONFERENCE

**I HEREBY CERTIFY** that counsel for the movant has conferred with all parties affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to do so and/or Opposing Counsel has objected to this Motion and thus Court intervention is required.

By:/s/ Brian Yosef
Brian Yosef, Esq.
Florida Bar No. 31179

**CERTIFICATE OF SERVICE**

  **I HEREBY CERTIFY** that on this 27th day of October, 2014, a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of Court which sent e-mail notification of such filing to all CM/ECF participants in this case, and a copy was forwarded via e-mail to: Jonathan E. Pollard, Esq., and Nathan M. Saunders, Esq., Jonathan Pollard, LLC, 401 E. Las Olas Bivd. #1400, Fort Lauderdale, FL 33301, jpollard@pollardllc.com and nsaunders@pollardllc.com.


By: /s/ Brian Yosef
Brian Yosef, Esq.
Florida Bar No. 31179